**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, ex rel. TRAKHTER, | ) ) ) | |
| Plaintiff-Relator, | ) ) | Civil Action No. **1:11 CV 217** |
| vs. | ) ) | JURY TRIAL DEMANDED |
| PROVIDER SERVICES, INC., n/k/a BCFL HOLDINGS, INC.; OLYMPIA THERAPY, INC.; and PROVIDER SERVICES HOLDINGS, LLC, | ) ) ) ) ) | SPIEGEL RECEIVED |
| Defendants. | ) | APR 1 8 2011 |

**COMPLAINT**

JAMES BONINI, Clerk
CINCINNATI, OHIO

Plaintiff, Vladimir Trakhter, by and through his attorneys, complains and alleges causes

of action against Provider Services, Inc. n/k/a BCFL Holdings, Inc., Olympia Therapy, Inc., and

Provider Services Holdings, LLC (collectively "Defendants") as follows:

1.     Qui tam plaintiff, Vladimir Trakhter ("Plaintiff" or "Relator"), brings this lawsuit

on behalf of the United States of America pursuant to the False Claims Act, 31 U.S.C. § 3729

and § 3730, *et seq.*, as amended from time to time.

2.     Plaintiff voluntarily contacted the United States Attorney at least one month prior

to filing the qui tam action, and he voluntarily made himself available to discuss the evidence

and information he possesses.  A copy of the proposed complaint and written disclosure of

substantially all material evidence and information the Plaintiff possesses has been served on the

United States government pursuant to Rule 4(i) of the Federal Rules of Civil Procedure.  This

complaint is filed in camera, under seal, and may not be served upon Defendants until further

order of this Court.

1

PARTIES, JURISDICTION AND VENUE

3.      Plaintiff is a physical therapy assistant ("PTA") licensed to practice in the State of Ohio. He is a resident and citizen of Dayton, Ohio. Plaintiff was employed by Olympia Therapy, Inc. to provide skilled physical therapy services to residents of an Ohio nursing home. (The term "Nursing Home," without more, is used throughout the Complaint in order to protect patient privacy).

4.      Defendant Provider Services, Inc. ("PSI"), an Ohio corporation, began operations in 1996 as an operator of long-term care ("LTC") facilities. According to a 2007 press release, PSI is Ohio's second largest LTC services provider with over 5,000 beds; it is estimated to care for over 12,000 residents with revenues exceeding $300 million annually.

5.      PSI owns, operates and controls numerous skilled, intermediate, and long-term care nursing facilities ("SNFs") throughout Ohio, including the Nursing Home. All of PSI's facilities are dually-certified for Medicare and Medicaid. Each SNF was a participating "provider" in the Medicare program at all relevant times herein.[1]

6.      Defendant Olympia Therapy, Inc., an Ohio corporation, provides physical therapy and rehabilitation services in Ohio. It is affiliated with PSI and shares, *inter alia*, a common website, registered agent, employee handbook, and retirement plan. Plaintiff was employed by Olympia Therapy, Inc. while working at PSI's Nursing Home.

7.      Defendant Provider Services Holdings, LLC is a corporation duly organized and licensed to do business in the State of Ohio. Upon information and belief, Provider Services

_____

[1] In July 2010, PSI merged out of existence. The surviving entity is BCFL Holdings, Inc., a for-profit company incorporated under the laws of Florida, with Brian Colleran – formerly of PSI – serving as President, incorporator, registered agent, officer(s) and director(s).

2

Holdings, LLC is a holding company that possesses a partial or complete controlling interest in another company or companies, including PSI.

8.     The Court has jurisdiction pursuant to 28 U.S.C. § 1331, because Plaintiff asserts claims arising under the laws of the United States, in particular the False Claims Act, 31 U.S.C. § 3729 and § 3730, *et seq.* Further, the Court has original jurisdiction over all civil actions, suits or proceedings commenced by the United States under 28 U.S.C. § 1345.

9.     Venue is proper pursuant to 31 U.S.C. § 3732, because an action under section 3730 may be brought in any judicial district in which the defendant or, in the case of multiple defendants, any one defendant can be found, resides, transacts business, or in which any act proscribed by section 3729 occurred. The acts complained of herein occurred throughout the State of Ohio, including in Cincinnati, Hamilton County, Ohio. Several of the Defendants transact business in Cincinnati, Hamilton County, Ohio as well.

10.     In addition, venue is proper pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to the claims occurred in Cincinnati, Hamilton County, Ohio. By way of example, the processing and paying of Defendants' Medicare claims and the auditing of Defendants' Medicare cost reports occurred in Cincinnati, Hamilton County, Ohio.

CLAIMS FOR RELIEF

11.     Title XVIII of the Social Security Act, 42 U.S.C. § 1395, *et seq.*, establishes the Health Insurance for Aged and Disabled program, commonly known as Medicare.

12.     Medicare is a federal health insurance program designed primarily for the elderly, is funded by payroll taxes, and is administered by the Centers for Medicare and Medicaid

3

Services ("CMS"), a part of the United States Department of Health and Human Services ("HHS").

13.    Medicare consists of several parts. Part A provides insurance for the costs of hospitalization and post-hospitalization, and Part B covers a percentage of the fees for physician and laboratory services. 42 U.S.C. §§ 1395c – 1395w-5.[2]

14.    To assist in the administration of Medicare Part A, CMS contracts with "fiscal intermediaries" who are responsible for processing and paying claims and auditing cost reports. The Part A fiscal intermediary for Ohio is National Government Services, a private company located in Cincinnati, Ohio, which also operates under the name Adminastar Federal.

15.    To assist in the administration of Medicare Part B, CMS contracts with "carriers" who are responsible for processing and paying claims and auditing cost reports. The Part B carrier for Ohio is Palmetto GBA, a private company located in Columbus, Ohio. On July 8, 2010, CMS announced that beginning around October 2011, the new carrier for Ohio will be Cigna.

16.    Fiscal intermediaries and carriers are agents of the United States for purposes of processing and paying Medicare claims. Medicare regulations require providers to furnish them with sufficient information to determine if payment is due and the amount of payment. 42 C.F.R. § 424.5(a)(6). Further, Medicare providers are required to disclose all known errors and omissions in their claims for Medicare reimbursement to their fiscal intermediaries and carriers. 42 U.S.C. § 1320a-7b(a).

---

[2] Part C includes Medicare Advantage and Medicare Supplement coverage; Part D covers prescription drugs.

17.     HHS issues a Medicare Claims Processing Manual, which is distributed to all Medicare providers, in order to inform them of its reimbursement policies and procedures. Similar manuals are provided to fiscal intermediaries.  These and other manuals are an essential source of information for Medicare providers and intermediaries regarding Medicare coverage policies.  Medicare providers have a legal duty to familiarize themselves with Medicare's reimbursement rules, including those stated in the manuals.

A.     Medicare Reimbursement Of Skilled Therapy Services

18.     Under the Social Security Act, 42 U.S.C. § 1395y(a)(1), Medicare is authorized to pay for items and services that are "reasonable and necessary" for the diagnosis or treatment of a patient's condition.

19.     Medicare provides reimbursement for SNF care that is reasonable and necessary. Generally, skilled care is available only for a short period of time after a hospitalization.  An individual must need skilled nursing or rehabilitation services daily in an inpatient setting and must require the skills of technical or professional personnel to provide these services.  42 C.F.R. §§ 409.31(b)(1) and (3) and 409.31(a)(2).  Examples of skilled care include physical therapy, changing sterile dressings, and intravenous injections.

20.     SNF care is reimbursable following a qualifying inpatient hospital stay of 3 consecutive days or more.  Medicare uses a period of time known as a benefit period to keep track of how many days of SNF benefits an individual uses and of how many days are still available.  An individual can get up to 100 days of SNF coverage in a benefit period before it must end.  Once the benefit period ends, an individual must have another 3-day qualifying hospital stay before getting up to another 100 days of SNF benefits.

5

21.     SNF care is typically reimbursed under Medicare Part A. The Part A SNF benefit covers skilled nursing care, rehabilitation services (i.e., physical, occupational, and speech therapy), and "other" services such as room and board. If a resident is not in a covered Part A stay (e.g., Part A benefits exhausted, post-hospital or level of care requirements not met, etc.), the SNF is required to bill for the services provided under Part B.

22.     Claims for Part A reimbursement are submitted by the SNF to the fiscal intermediary on Form CMS-1450 or its electronic equivalent (now known as Form UB-04), and the fiscal intermediary requests payment from the United States on behalf of the SNF. The signer of Form CMS-1450 certifies that the information submitted as part of the claim is true, accurate and complete, and that the services shown on the form are medically indicated and necessary for the health of the patient. The signer of Form UB-04 certifies that the billing information shown is true, accurate and complete, and that the signer did not knowingly or recklessly misrepresent or conceal material facts. Anyone who misrepresents or falsifies essential information requested by the forms may be subject to fine and/or imprisonment under federal law.

23.     In July 1998, CMS implemented a per day prospective payment system ("PPS") for SNFs as required by the Balanced Budget Act of 1997. The PPS is the system by which Medicare reimburses SNFs for services under Part A. It categorizes each resident into a payment group depending upon his or her care and resource needs. These are referred to as Resource Utilization Groups ("RUGs"), and each RUG represents a different Medicare payment rate.[3]

---

[3] The PPS has been the subject of considerable criticism over the years. An OIG report found that 26 percent of claims submitted by SNFs in 2002 were not supported by the medical record, representing $542 million in potential overpayments. Further, the Medicare Payment Advisory

24.     There are 53 RUG classifications, which Medicare groups into 8 distinct categories. Two categories – Rehabilitation and Rehabilitation Plus Extensive Services – are for patients who need physical therapy, speech therapy, or occupational therapy ("Therapy RUGs"). The remaining 6 categories are for patients who require very little or no therapy.

25.     Therapy RUGs are largely based on treatment minutes and treatment frequency during an assessment (or look-back) period. The greater the amount of therapy provided a resident during the look-back period, the higher the RUG classification and *vice versa*.

26.     Assessment periods occur at set intervals throughout a patient's Part A covered stay. During a 100-day maximum stay, patient assessments must occur on the 5th, 14th and 30th day of a resident's stay, and every 30 days thereafter. 42 C.F.R. § 413.343.

27.     The Assessment Reference Date ("ARD") is the last day in an observation period and determines the window of time for collecting information for Medicare payment purposes. The ARD marks the end of the look-back period. For the Medicare 5-day assessment, days 1-5 can be used to set the ARD; for the Medicare 14-day assessment, days 11-14 can be used; for the

---

Commission has raised concerns about SNFs improperly billing for therapy to obtain additional Medicare payments. Specifically, MedPAC noted that the current system encourages SNFs to furnish therapy, even when it is of little or no benefit. In addition, CMS has noted that some facilities, to increase payments, may be inappropriately overstating a beneficiary's need for assistance with certain activities of daily living ("ADL"). See HHS Office of Inspector General, *Questionable Billing by Skilled Nursing Facilities*, at p. 1 (Dec. 2010) (available at http://oig.hhs.gov/oei/reports/oei-02-09-00202.asp).

Medicare 30-day assessment, days 21-29 can be used; for the Medicare 60-day assessment, days 50-59 can be used; and for the Medicare 90-day assessment, days 80-89 can be used.[4]

28.     The information gathered at these intervals is reported on a Minimum Data Set ("MDS"), which is a legal document used to record and report all services rendered during the assessment reference period. It is a standardized tool that assesses the patient's clinical condition, functional status, and expected use of services.

29.     The Social Security Act, as amended by the Omnibus Budget Reconciliation Act of 1987, requires SNFs to complete a MDS for each resident. 42 U.S.C. § 1395i-3(b)(3)(A). The Therapy RUGs captured by the 5-day, 14-day, 30-day, 60-day and 90-day assessments determine the amount of Medicare reimbursement. See HHS Office of Inspector General, *Questionable Billing by Skilled Nursing Facilities*, at p. 15 (Dec. 2010) ("The amount of therapy that the SNF provides to the beneficiary during the look-back period largely determines the amount that Medicare pays the SNF.") (available at http://oig.hhs.gov/oei/reports/oei-02-09-00202.asp).

30.     Therapy RUGs are divided into 5 levels of therapy: Ultra High, Very High, High, Medium and Low. SNFs place patients into one of the five categories based primarily on the number of minutes of therapy provided during the look-back periods. The required minutes for each classification are as follows:

---

[4] Grace periods can be utilized to briefly extend these deadlines, but CMS emphasizes that grace periods "should be used sparingly." HHS Office of Inspector General, *Questionable Billing by Skilled Nursing Facilities*, at p. 3 (Dec. 2010) (available at http://oig.hhs.gov/oei/reports/oei-02-09-00202.asp).

| RUG-III Rehabilitation Classification Codes | | |
|---|---|---|
| Classification | Codes | Criteria |
| Ultra High | | |
|     Rehabilitation | RUA, RUB, RUC | Rehab Therapy for a minimum of 720 minutes per week; and |
| | | At least 1 rehab discipline 5 days per week; and |
| | | 2nd discipline 3 days per week |
|     Rehabilitation plus Extensive Services | RUL, RUX | Rehabilitation criteria plus ADL score of 7 or higher; and |
| | | Receiving one or more of the following extensive services (Parental/IV, IV medications, suctioning, tracheotomy care, or ventilator or respirator) |
| Very High | | |
|     Rehabilitation | RVA, RVB, RVC | Rehab Therapy for a minimum of 500 minutes per week; and |
| | | At least 1 rehab discipline 5 days per week |
|     Rehabilitation plus Extensive Services | RVL, RVX | Rehabilitation criteria plus ADL score of 7 or higher; and |
| | | Receiving one or more of the following extensive services (Parental/IV, IV medications, suctioning, tracheotomy care, ventilator or respirator) |
| High | | |
|     Rehabilitation | RHA, RHB, RHC | Rehab Therapy for a minimum of 325 minutes per week; and |
| | | At least 1 rehab discipline 5 days per week |

9

| | | |
|---|---|---|
| Rehabilitation plus Extensive Services | RHL, RHX | Rehabilitation criteria plus ADL score of 7 or higher; and<br><br>Receiving one or more of the following extensive services (Parental/IV, IV medications, suctioning, tracheotomy care, ventilator or respirator) |
| **Medium** | | |
| Rehabilitation | RMA, RMB, RMC | Rehab Therapy for a minimum of 150 minutes per week; and<br><br>Any combination of the three rehab disciplines for 5 days |
| Rehabilitation plus Extensive Services | RML, RMX | Rehabilitation criteria plus ADL score of 7 or higher; and<br><br>Receiving one or more of the following extensive services (Parental/IV, IV medications, suctioning, tracheotomy care, ventilator or respirator) |
| **Low** | | |
| Rehabilitation | RLA, RLB | Rehab Therapy for a minimum of 45 minutes per week; and<br><br>Any combination of the three rehab disciplines for 3 days; and<br><br>2 or more nursing rehabilitation services received at least 15 minutes each for 6 days per week |
| Rehabilitation plus Extensive Services | RLX | Rehabilitation criteria plus ADL score of 7 or higher; and<br><br>Receiving one or more of the following extensive services (Parental/IV, IV medications, suctioning, tracheotomy care, |

| | | ventilator or respirator) |
|---|---|---|

31.     Medicare payment rates for Therapy RUGs are almost twice as high, on average, as the rates for nontherapy RUGs.  HHS Office of Inspector General, *Questionable Billing by Skilled Nursing Facilities*, at p. 4 (Dec. 2010) (available at http://oig.hhs.gov/oei/reports/oei-02-09-00202.asp).  In addition, Medicare generally pays more for higher levels of therapy.  Id.  In late 2008 and 2009, respectively, CMS published the reimbursement rates for the daily therapy components of each RUG category for FFY 2009 and FFY 2010:

| Medicare Prospective Payment System for Skilled Nursing Facilities | | | |
|---|---|---|---|
| Classification | FFY 2009 Daily Therapy Component (Urban/Nationwide) | FFY 2010 Daily Therapy Component (Urban/Nationwide) | Blended FFY 2009/FFY 2010 Daily Therapy Component (Urban/Nationwide) |
| Ultra High | 257.18 | 263.09 | 259.87 |
| Very High | 161.16 | 164.87 | 162.85 |
| High | 107.44 | 109.91 | 108.56 |
| Medium | 88.01 | 90.04 | 88.93 |
| Low | 49.15 | 50.28 | 49.66 |

The foregoing rates provide a financial incentive for SNFs to inflate the level of care (treatment minutes), because a bed occupied by a patient in the Ultra High classification is reimbursable at approximately 500% of the rate of the same bed occupied by a patient in the Low classification.  See HHS Office of Inspector General, *Questionable Billing by Skilled Nursing Facilities*, at p. iii (Dec. 2010) ("[T]he current payment system provides incentives to SNFs to bill for ultra high therapy and for high levels of assistance when these levels of care may not be needed.") (available at http://oig.hhs.gov/oei/reports/oei-02-09-00202.asp).

32.     In addition to claims for patient reimbursement, providers of skilled care are required to submit a SNF cost report annually, Form CMS 2540-96, which summarizes the amount of payments received and the amount to which they claim entitlement from Medicare. The SNF cost report contains a certification that must be signed by an officer or administrator of the provider, certifying that the report is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions. Further, the signatory must certify that he or she is familiar with the laws and regulations regarding the provision of health care services, and that the services identified in the cost report were provided in compliance with such laws and regulations. Misrepresentation or falsification of any information contained in the cost report may be punishable by criminal, civil and administrative action, fine and/or imprisonment under federal law.

B.     Upcoding And Overutilization By Defendants

33.     Plaintiff was employed by Olympia Therapy, Inc. to provide skilled physical therapy services to residents of the Nursing Home. The facility is sub-standard, and it receives low marks from government agencies. For example, the Nursing Home was rated only 1 out of 5 stars by Medicare.gov on October 28, 2010, and it received a 1 out of 5 overall rating from a health inspection on July 9, 2009.

34.     At the Nursing Home and other PSI facilities, the Rehab Director coordinates the setting and management of RUG classifications (treatment minutes). Sherri Daily is the Rehab Director at the Nursing Home. She ultimately reports to Terri Bradford, PSI's Therapy Director of Operations.

35.     PSI and Olympia Therapy systematically inflate the level of care, utilize improper methods to bill the required number of minutes, and otherwise provide unnecessary services for

the purpose of obtaining higher levels of Medicare reimbursement. They intentionally place patients in the higher RUG classifications, even though such care is not reasonable and necessary for the treatment of their conditions.

36.     In furtherance of this scheme, PSI and Olympia Therapy instruct therapists and therapy assistants to bill minutes in "creative" ways. For example, when patients are physically incapable of exercising for the prescribed amounts of time, therapists are told that they should nevertheless bill time spent talking to residents as "patient education." PSI and Olympia Therapy also bill for time spent by residents in the SNF gym, regardless of whether residents are engaged in any activities. Plaintiff witnessed such practices on a regular basis throughout the entirety of his employment at the Nursing Home, from May 2009 – February 2010.

37.     The imperative to meet "budgeted numbers" and to bill "creatively" is demonstrated by an e-mail from Terri Bradford of PSI, Regional Director, to Aaron Ivy of Olympia Therapy (and numerous other recipients in managerial positions), dated July 16, 2009:

> Hi everyone:
>
> We need to closely monitor productivity. If your staff is not consistently meeting 85% we need to sit down and figure out why. If it is a training issue with the computer we will provide 1 on 1 training. If their productivity is low due to not having the caseload then we need to be creative and pick up the part B's. If they are insisting that no one would benefit from Part B then maybe we can send in a different therapist with a fresh set of eyes or ideas. If the case load is not there then they will need to go to another facility to help out or we will need to send them home.
>
> The Administrators are going to be leaning hard on you guys for assistance with the part B revenue. We need to dig down deep and be as creative as possible. ANY suggestions that anyone can share with all of us will be greatly appreciated and welcomed!! We need to at a minimum hit the budgeted numbers.

13

> They are also going to be expecting at least 70% in the upper 9
> categories. If we need to do bid [note: twice daily] treatments for
> those that cannot tolerate as many minutes at a time then that is
> what we need to do. We may need to provide weekend therapy so
> we can decrease the minutes but over a 7 day period so we can
> achieve those goals. Again, if the caseload is low, they can get
> their time in by doing bid treatments.

The clear implication is that budgeted numbers, rather than patient needs, are the overriding consideration at PSI and Olympia Therapy. Further, if a therapist is unwilling or unable to meet budgeted numbers, then he or she is to be weeded-out, i.e., either sent to another facility or sent home, in order to make room for someone willing to meet Defendants' financial targets.

38.     As a result of Defendants' practices and procedures, the needs of residents – the majority of whom are elderly, often in their 80's and 90's, and sometimes suffering from dementia – are disregarded. In some cases, patients are forced to engage in billable "activities" even when they are too fatigued to do them. Many patients are on dialysis as a result of kidney failure or other problems but are brought in for therapy immediately after exhausting dialysis treatment. In other instances, patients are cajoled until they engage in some activity that can be considered billable, solely for the purpose of attaining the higher RUG classifications. Such pressure tactics, applied to weak, often mentally disabled patients amounts, essentially, to coercion and conflicts with a patient's right to refuse treatment.

39.     Plaintiff has personal knowledge of numerous examples of unnecessary and inappropriate treatment at the Nursing Home during 2009-2010, including, but not limited to, the following:

A.  Patient 1 presented with a weak heart, a mood disorder and a temper. He also had kidney failure and low endurance. He was overworked and attempted to refuse treatment by two therapists (David, a PTA, and Brendan, an occupational therapy assistant). After arguing

14

with them about his inability to engage in therapy, he suffered cardiac arrest and could not be resuscitated.

B. Patient 2 had multiple back problems, including severe osteoarthritis. He was assigned 75 minutes of therapy. He was overworked during therapy and told Jana that he was unable to continue. He was required to do so anyway. Patient 2 was diagnosed with a compression fracture on [date omitted], following occupational therapy performed by Jana.

C. Patient 3 suffered from kidney failure and was on dialysis. He had pain in his legs and back. Following a dialysis session, he was given therapy that he was unable to tolerate. He tried to refuse physical therapy many times. On [date omitted], he was given 135 minutes of occupational therapy before dialysis and another 90 minutes of physical therapy after dialysis because, according to Director Daily, the facility "needed him in the Ultra High category."

D. Patient 4 presented with low back pain and very poor stamina. He received 60 minutes of therapy while covered under Part A. Despite no change in his condition, his minutes dropped precipitously when he was moved to Part B coverage.

E. Patient 5 was admitted to the Nursing Home, assigned a therapy level allegedly based on her medical condition and was receiving therapy. When PSI realized that she was ineligible for Part A coverage – because of a recent SNF stay – she was involuntarily discharged. Plaintiff was ordered not to disclose to Patient 5 the reason for her discharge, but to write in her medical record that she had "met her therapy goals" when, in fact, the

reason she was being discharged was due to Part A ineligibility. Plaintiff was terminated for refusing to deceive the patient.[5]

F. Patient 6 was a nun, age 90 or older, who did not want to receive therapy. She was given therapy against her will.

G. Patient 7 came from a group home and suffered from impaired cognitive abilities. She was unable to retain instructions from day-to-day because of poor memory. She was regularly prescribed 75 minutes of therapy, even though she was in her fifties and did not need physical therapy.

H. Patient 8 suffered from low endurance and poor memory and was receiving long-term care as a Part B resident. She was given 60 minutes of physical therapy, despite the fact that she consistently requested less minutes.

I. Patient 9 had very poor stamina and did not want to do any therapy because she was confined to a wheelchair. She was forced to do it anyway.

J. Patient 10 had poor stamina and could not ambulate. She refused treatment but nevertheless was required to engage in therapy, during which she lost her balance, fell and was injured.

K. Patient 11 had dementia, respiratory problems, heart problems, and a urinary tract infection. Plaintiff requested that she be placed on a medical hold and that a nurse check on her, but his request was ignored for three days. She was subsequently placed on hold for one week but did not recuperate completely. Plaintiff warned Director Daily that

---

[5] Discharging a patient for non-coverage instead of completion of goals violates 42 U.S.C.A. § 1395, *et seq.*

Patient 11 was not able to continue therapy. Patient 11 was re-assigned to another PTA, and she passed-out during therapy in the gym.

L.  Patient 12 had reduced mental capacity and could not remember basic instructions from day-to-day. Plaintiff spoke with his supervisor, Julie C., and told her that she was not an appropriate candidate for the prescribed therapy. Julie C.'s response was that "she was asked to pick up Part B's" and so therapy was repeatedly performed.

M.  Patient 13 was treated by Plaintiff in [date omitted]. She was diagnosed with dementia, had poor stamina and a leg fracture that required her to wear a special boot. She refused therapy on or about [date omitted], but nevertheless was coerced into it.

N.  Patient 14 was very obese and receiving therapy under Part B. She had difficulty with 15 minutes of therapy. Due to unrelated complications, she was admitted to a hospital, and then discharged back to the facility, where she refused treatment but was given 75 minutes per day of physical therapy. Plaintiff notified Director Daily that the patient was being given more therapy than she could tolerate, whereupon the patient was re-assigned to another PTA.

(Names and dates are being withheld in order to protect patient privacy.)

40.     Plaintiff warned Director Daily on numerous occasions that patients were given more therapy than they could physically tolerate. Director Daily told him to be a team player and not to bother her with complaints about therapy minutes, because he was being paid good money. Instead of reevaluating patients to determine appropriate therapy levels, Director Daily would transfer the patients to therapists who would bill the minutes regardless of patients' needs.

41.     In one employee meeting (approximately September 2009), Director Daily singled-out Plaintiff's complaints as inappropriate as a reminder to therapists that the most

17

important consideration is to obtain all minutes. Further, Director Daily stated that if a resident can tolerate 30 minutes of therapy, then he or she can tolerate 75 minutes of therapy.

42.     During the same meeting, Director Daily emphasized the importance of tracking therapy minutes during Part A assessment periods. For patients "in assessment," therapists were instructed to accomplish all minutes, but if they could not, they were to go to Director Daily's office and write the names of shortfall patients on her chalkboard, together with the numbers of minutes they were able to accomplish. She would relay the information to therapists staying late who would perform catch-up therapy on these individuals. This procedure was not required for Part A patients during non-assessment periods.

43.     Similarly, Plaintiff was often asked to work weekends, usually by himself, to perform catch-up therapy on Part A patients "in assessment." On August 22, 2009, Director Daily instructed Plaintiff in writing to "go ahead" and to decrease "minutes on people _not_ in assessment" because she "need[ed] min[utes]" for certain patients in assessment (emphasis in original).

44.     Plaintiff's observations are supported by statistical analysis, which shows that the Nursing Home assigns patients to Ultra High and Very High categories above national averages.[6]

---

[6] The national averages already are inflated. As the HHS Office of Inspector General noted, "SNFs increasingly billed for higher paying RUGs from 2006 to 2008. Specifically, payments to SNFs for ultra high therapy increased by nearly 90 percent, or $5 billion, from 2006 to 2008…This shift toward higher paying RUGs did not appear to be the result of changes in beneficiary characteristics, such as age and diagnosis." HHS Office of Inspector General, _Questionable Billing by Skilled Nursing Facilities_, at p. 4 (Dec. 2010) (available at http://oig.hhs.gov/oei/reports/oei-02-09-00202.asp).

For example, Medicare published data from FFY 2009 for all facilities nationwide, which showed the entire population of patients in each RUG classification during this interval. The RUG classification, the number of service days in each category, and the percentage it represents were as follows:

| CMS Days of Service, Federal Fiscal Year 2009, Urban | | | |
|---|---|---|---|
| Classification | Minutes | Total Days | Percentage |
| Ultra High | 720 | 21,152,696 | 43.30% |
| Very High | 500 | 13,645,743 | 27.93% |
| High | 325 | 4,570,883 | 9.36% |
| Medium | 150 | 9,417,234 | 19.28% |
| Low | 45 | 63,236 | 0.13% |
| All | | 48,849,792 | 100.00% |

45.     An analysis of Plaintiff's workload, which was representative of other PTAs, was performed for purposes of comparison. Specifically, sixty-seven work days were examined during a random period between April 2009 and February 2010, for a total of 751 scheduled treatment sessions. Of the 751 treatment sessions, a total of 424 involved Part A recipients. Of the 424 Part A treatment sessions, 183 fell within standard assessment periods (i.e., days 1-5, 11-14, 21-29, 50-59 and 80-89) while the remaining 241 fell outside (i.e, days 6-10, 15-20, 30-49, etc.).

46.     The corresponding results of the Nursing Home sample were as follows:

| Classification | Minutes | Part A Assessment | | Part A Non-Assessment | | All Part A | |
|---|---|---|---|---|---|---|---|
| | | Count | Percentage | Count | Percentage | Count | Percentage |
| Ultra High | 720 | 90 | 49.18% | 98 | 40.66% | 188 | 44.34% |
| Very High | 500 | 73 | 39.89% | 86 | 35.68% | 159 | 37.50% |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| High | 325 | 14 | 7.65% | 48 | 19.92% | 62 | 14.62% |
| Medium | 150 | 6 | 3.28% | 9 | 3.73% | 15 | 3.54% |
| Low | 45 | - | - | 0 | 0.00% | 0 | 0.00% |
| Total | | 183 | 100% | 241 | 100.00% | 424 | 100.00% |

As is evident, the percentage of Nursing Home patients placed in higher RUG classifications exceeded national averages, and the percentage of Nursing Home patients placed in lower RUG classifications fell below national averages.

47.     Further analysis was performed to determine whether differences in the Nursing Home sample, when compared to the nationwide Medicare population for the equivalent period, were statistically-significant. The data was analyzed using a two-tailed t-test. (A t-test assesses whether the means of two groups are statistically different from each other; a two-tailed test is used when one does not anticipate differences between groups, such as between the nationwide Medicare population and the Nursing Home population.) The adjusted mean of the Nursing Home sample was determined to be 559.58 minutes, with a standard deviation of 163.66 minutes. The adjusted mean of the nationwide Medicare sample was determined to be only 510.83 minutes, with a standard deviation of 218.15 minutes.

48.     The formula for the t-test is a ratio. The top part of the ratio (numerator) is the difference between the two means or averages; the bottom part (denominator) is the measure of variability or dispersion of the scores, sometimes called the "standard error of the difference." This calculation yielded a t-value of 6.1332.

49.     A "table of significance" was utilized to test whether the ratio was large enough to say that the difference between the groups was not likely to have been a chance finding. It was determined that the probability of this occurring by chance – that is, with the means of the two groups being so different from each other randomly – was approximately 1 in 505,445,164. It is

20

therefore statistically improbable that the distribution of minutes for patients at the Nursing Home is what would be expected if the sample was taken from the entire population of Medicare patients nationwide during the period.

50.     Further testing was performed to eliminate the possibility that the population of patients accepted by the Nursing Home was significantly more impaired than the nationwide Medicare population generally.  Two groups were identified from the data: (1) Medicare Part-A patients receiving therapy during assessment periods and for which reimbursement requests were made based upon RUG guidelines derived, in part, from therapy minutes received ("Medicare Part A Assessment patients"); and (2) all other patients at the Nursing Home, including Medicare Part A patients receiving therapy during non-assessment periods ("Non-Medicare Part A Assessment patients").  It was determined that the average number of therapy minutes received by Medicare Part A Assessment patients at the Nursing Home during the randomly sampled period was greater than the minutes received by Non-Medicare Part A Assessment patients for the same time period.  Based upon the difference between the average number of minutes of therapy received, the sample size, and other derived statistical characteristics (including the standard deviation), it was determined that it was extremely unlikely that the observed difference in therapy minutes resulted from mere chance.  Specifically, the possibility that the two groups were, in fact, identical, but appeared to be significantly different based upon an inadequate sample size, was determined to be less than one in a billion.

51.     These findings demonstrate that Medicare Part A Assessment patients receive significantly more therapy minutes than do similarly-situated Non-Medicare Part A Assessment patients at the Nursing Home.  Given that the analysis of the two groups had been isolated to control for a single variable (assessment vs. non-assessment), it can be inferred that the cause of

the difference is the reimbursement factors referred to herein. It likewise can be inferred that the Nursing Home increases the number of minutes of therapy prescribed for Medicare Part A Assessment period patients (compared to all other patients) regardless of the patients' actual medical needs.

52. Additional data was sampled, analyzed, and extrapolated for the purpose of comparing two patient groups: Medicare Part A Assessment patients (as defined above), and Medicare Part A patients who were not in the midst of assessment periods ("Medicare Part A Non-Assessment patients"). It was observed that Medicare Part A Assessment patients receive approximately forty minutes of therapy more than Medicare Part A Non-Assessment patients per equivalency period. Statistical analysis determined that the likelihood that the outcome observed was due to chance was less than 1 in 6,040, leading to the conclusion that, in fact, Medicare Part A Assessment patients receive a greater amount of therapy than their counterparts who are not in the midst of assessment periods.

53. There are no identifiable medical factors to explain this difference. The only difference between the sampled groups referred to in Paragraph 52 is whether the Medicare Part A patient is in the midst of an assessment period. The similarity of patient groups strongly suggests that the difference in minutes is explainable by the fact that more minutes are ordered during assessment periods for the sole purpose of increasing the RUG levels of the Medicare Part A recipients, and correspondingly, the reimbursement received by the Nursing Home from Medicare. There is no legitimate reason that minutes prescribed during assessment periods (used to assign RUG levels) should be significantly different than minutes prescribed during other periods (not used to assign RUG levels).

54.     These findings are consistent with the conclusions of the HHS Office of Inspector

General, who found that *inter alia*:

> **From 2006 to 2008, SNFs increasingly billed for higher paying RUGs, even though
> beneficiary characteristics remained largely unchanged.** From 2006 to 2008, the
> percentage of RUGs for ultra high therapy increased from 17 to 28 percent...Even though
> SNFs significantly increased their billing for these higher paying RUGs, beneficiaries'
> ages and diagnoses at admission were largely unchanged from 2006 to 2008.
>
> **For-profit SNFs were far more likely than nonprofit or government SNFs to bill for
> higher paying RUGs.** In total, 32 percent of RUGs from for-profit SNFs were for ultra
> high therapy, compared to 18 percent from nonprofit SNFs and 13 percent from
> government SNFs...For-profit SNFs also had longer lengths of stay, on average,
> compared to those of the other types of SNFs. The differences among types of SNF
> ownership did not appear to be the result of differences in SNF's beneficiary
> populations...
>
> **A number of SNFs had questionable billing in 2008.** Some SNFs billed much more
> frequently for higher paying RUGs than other SNFs. Some SNFs also had unusually
> long average lengths of stay compared to those of other SNFs. These billing patterns
> indicate that certain SNFs may be routinely placing beneficiaries into higher paying
> RUGs regardless of the beneficiaries' care and resource needs or keeping beneficiaries in
> Part A stays longer than necessary...

HHS Office of Inspector General, *Questionable Billing by Skilled Nursing Facilities*, at p. ii

(Dec. 2010) (emphasis in original) (available at http://oig.hhs.gov/oei/reports/oei-02-09-

00202.asp).

55.     The HHS Officer of Inspector General noted that the shift to Ultra High therapy

RUGs has caused a substantial increase in Part A payments to SNFs in recent years. Id., at p. 10

("Overall, payments increased by $4.3 billion, or 18 percent, from 2006 to 2008...[P]ayments to

SNFs for ultra high therapy rose from $5.7 billion in 2006 to $10.7 billion in 2008, an increase of

nearly 90 percent.").[7]

---

[7] "The shift to ultra high therapy RUGs was also associated with an increased use of grace

periods...SNFs used grace periods for 96 percent of ultra high therapy RUGs, compared to 55

56.     As borne out by Plaintiff's personal observations and subsequent analysis, it is Defendants' practice and procedure to overstate the RUG classifications of Medicare Part A patients for purposes of financial gain. Medicare Part A recipients are manipulated and given elevated levels of therapy in order to increase Defendants' Medicare reimbursements. The elevated levels of therapy are quantifiable and statistically-significant.

57.     It is conservatively estimated that Defendants over-billed the United States government $49,620.95 per day, assuming 5,000 beds. Operating year-round, this would result in a revenue loss to the United States government of $18,124,052 annually (assuming 365.25 days per year). The exact determination of these amounts will require additional data from Defendants.

58.     Plaintiff has direct and independent knowledge of the facts underlying the complaint, and the facts and allegations underlying the complaint have not been publicly disclosed as defined by the False Claims Act, 31 U.S.C.A. § 3730(e), as amended from time to time. The allegations of unreasonable, unnecessary and fraudulent services are based upon information that Plaintiff learned and saw with his own eyes while employed by Olympia Therapy.

59.     The following documents and information are in Defendants' custody and control and contain additional evidence of fraud: physical therapy daily worksheets, occupational therapy daily worksheets, therapy minute/unit logs and daily treatment notes, Forms SNF 2540-96, CMS-1450 and UB-04, orders, treatment plans, progress notes, evaluations and re-

---

percent for other therapy RUGs and 20 percent for nontherapy RUGs. SNFs likely used grace periods for ultra high therapy RUGs because the grace periods allow them to count more days of therapy when determining the RUG." Id.

evaluations, visit notes, look-back data, grace period data, MDSs, and other documents and information.

60.     While Plaintiff has personal knowledge of unnecessary, inappropriate and fraudulent services, because Defendants are engaged in the health care field, patient confidentiality prohibits Plaintiff from obtaining additional information at this time. Defendants possess records that will provide additional evidence of fraud and that are discoverable with adequate protections being made through protective orders to satisfy the requirements of HIPAA Privacy Regulations.

COUNT I – PRESENTATION OF FALSE CLAIMS
IN VIOLATION OF FCA, 31 U.S.C. § 3729(a)(1)(A)

61.     Plaintiff repeats, re-alleges and incorporates by reference paragraphs 1-60 of this Complaint as if more fully set forth herein.

62.     Between 2005 and continuing to the present, Defendants engaged in a complex and far-ranging scheme to bill Medicare for SNF services that were not reasonable and necessary. It was Defendants' practice to routinely assign residents to higher paying Therapy RUGs, regardless of care and resource needs, for the purpose of obtaining higher levels of Medicare reimbursement. The scheme involved, *inter alia*, "creative" billing, excessive therapy, unnecessary services, "phantom" services, and coercive treatments. As a result of these practices and procedures, Defendants' reports (SNF 2540-96) and Medicare reimbursement claims (CMS-1450; UB-04) contained inflated costs. Defendants received $100 - 300 million in excess Medicare reimbursements over six years as a result of these false claims. The exact determination of this amount will require additional data from Defendants.

63.     Defendants' submission of Form CMS-1450, Form UB-04 or their electronic equivalents, with the accompanying certification that the services were reasonable and necessary,

25

constituted the submission of a claim to an agent of the United States government.  Likewise, Defendants' submission of Form SNF 2540-96 or its electronic equivalent, with the accompanying certification that the report was true, correct and complete, constituted the submission of a claim to an agent of the United States government.

64.     Between 2005 and continuing to the present, Defendants submitted Medicare reimbursement claims that were false or fraudulent.  They falsely certified that the information submitted as part of the claim was true, accurate and complete, and that the services shown on the form were reasonable and necessary for the health of the patient.

65.     Between 2005 and continuing to the present, Defendants submitted Medicare reimbursement claims that were false or fraudulent.  They failed to disclose that Defendants were seeking payment for non-covered and non-reimbursable services.

66.     Between 2005 and continuing to the present, Defendants submitted Medicare reimbursement claims that were false or fraudulent.  They failed to disclose all known errors and omissions in their claims for reimbursement to their fiscal intermediary.

67.     Between 2005 and continuing to the present, Defendants submitted Medicare reimbursement claims that were false or fraudulent.  They failed to furnish the fiscal intermediary with sufficient information to determine if payment was due and the amount of payment.

68.     Between 2005 and continuing to the present, Defendants submitted Medicare cost reports that were false or fraudulent.  They falsely certified that the cost reports, balance sheets, and statements of revenue and expenses were true, correct and complete.

69.     Between 2005 and continuing to the present, Defendants submitted Medicare cost reports that were false or fraudulent.  They falsely certified that the provider was familiar with

the laws and regulations regarding the provision of health care services, and that the services identified in the cost reports were provided in compliance with such laws and regulations.

70.     Between 2005 and continuing to the present, Defendants submitted Medicare cost reports that were false or fraudulent. They failed to disclose that Defendants had received payment for non-covered and non-reimbursable services.

71.     Between 2005 and continuing to the present, Defendants knowingly presented, or caused to be presented, to an agent of the United States government the false and fraudulent claims for payment or approval, because they had actual knowledge of non-covered and non-reimbursable services. In the alternative, they acted in deliberate ignorance of or in reckless disregard of the information's truth or falsity, because providers in the Medicare program, like Defendants, have a duty to familiarize themselves with the legal requirements for payment.

72.     By submitting these false and fraudulent claims, Defendants knowingly and falsely implied that they were entitled to payment of the claims.

73.     Examples of Defendants' false and fraudulent claims include, *inter alia*, claims seeking reimbursement for the unnecessary and unreasonable services detailed in paragraph 39, above, and corresponding SNF cost reports for FFY 2009 and FFY 2010 containing such charges. Examples of Defendants' fraudulent reimbursement scheme include, *inter alia*, the assigning of patients to higher paying RUGs irrespective of care or resource needs, billing for therapy services not provided, and the basing of treatment decisions on payment opportunities and targeted numbers.

74.     As a direct and proximate result of the foregoing, the United States government has been defrauded out of substantial amounts of money. Between 2005 and continuing to the

27

present, it was induced to reimburse Defendants for services that were not reasonable and necessary and, in some cases, not even provided.

75.     Defendants are liable to the United States for three times the amount of all such sums paid by the United States in response to the false claims submitted by Defendants.  In addition, Defendants are liable for mandatory civil penalties for each false claim submitted to an agent of the United States, adjusted for inflation under the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, and for prejudgment and post-judgment interest that attaches to such amounts and claims.

76.     Having brought this action on behalf of the United States, Plaintiff is entitled to a percentage of the proceeds of the action collected by the United States as a result of the institution of this action, plus reasonable expenses, costs and attorneys' fees associated with the prosecution of this action.  He seeks the maximum amounts permitted by law and requests a jury trial on all counts.

WHEREFORE, the United States of America, ex rel. through Plaintiff, prays that:

A.     Defendants be required to answer this complaint;

B.     a judgment be entered in favor of United States ex rel. Plaintiff, which awards damages in an amount that is three times the amount of all sums paid by the United States of America as a result of Defendants' violations of 31 U.S.C. § 3729, plus mandatory statutory penalties pursuant to 31 U.S.C. § 3729(a);

C.     the Court award Plaintiff on his own behalf the maximum percentage of the proceeds collected by the United States of America as a result of the institution of this action, plus expenses, costs and attorneys' fees incurred by Plaintiff in bringing this action, as authorized by the False Claims Act, 31 U.S.C. § 3730(d)(1)-(2); and

28

D.     the Court award Plaintiff such other and further relief as the Court deems just and

proper.

COUNT II – MAKING OR USING FALSE RECORD OR
STATEMENT TO CAUSE FALSE CLAIM TO BE
PRESENTED IN VIOLATION OF FCA, 31 U.S.C. § 3729(a)(1)(B)

77.     Plaintiff repeats, re-alleges and incorporates by reference paragraphs 1-76 of this

Complaint as if more fully set forth herein.

78.     In the alternative, Defendants knowingly made, or caused to be made, false

records and statements and then used, or caused to be used, these records and statements to

obtain Medicare payments.  Between 2005 and continuing to the present, Defendants made,

used, or caused to be made or used, *inter alia*, daily worksheets, minute logs, treatment plans,

MDSs, "creative" billing practices, and coercive statements in order to fabricate Ultra High and

Very High RUG classifications.  Such treatment minutes were not reasonable and necessary for

the health of Defendants' patients.

79.     Such records and statements were used to document the services provided to

patients and then used to bill the United States government.  They served as the basis for

Defendants' Medicare claims, and in particular the submission of Forms CMS-1450, UB-04 and

SNF 2540-96.  The records and statements had a natural tendency to influence, or were capable

of influencing, the payment of money by the United States government.

80.     Defendants knew that the statements and records were false.  They knew that the

services, and in particular the RUG classifications and treatment minutes, were fraudulently

higher than warranted.  In the alternative, they acted in deliberate ignorance of or in reckless

disregard of the information's truth or falsity, because providers in the Medicare program, like

Defendants, have a duty to familiarize themselves with the legal requirements for payment.

29

81.     As a direct and proximate result of the foregoing, the United States government has been defrauded out of substantial amounts of money. Between 2005 and continuing to the present, it was induced to reimburse Defendants for services that were not reasonable and necessary and, in some cases, not even provided. Examples include, but are not limited to, payments for the services detailed in paragraphs 36 and 39, above.

82.     Defendants are liable to the United States for three times the amount of all such sums paid by the United States in response to the false claims submitted by Defendants. In addition, Defendants are liable for mandatory civil penalties for each false claim submitted to an agent of the United States, adjusted for inflation under the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, and for prejudgment and post-judgment interest that attaches to such amounts and claims.

83.     Having brought this action on behalf of the United States, Plaintiff is entitled to a percentage of the proceeds of the action collected by the United States as a result of the institution of this action, plus reasonable expenses, costs and attorneys' fees associated with the prosecution of this action. He seeks the maximum amounts permitted by law and requests a jury trial on all counts.

WHEREFORE, the United States of America, ex rel. through Plaintiff, prays that:

A.     Defendants be required to answer this complaint;

B.     a judgment be entered in favor of United States ex rel. Plaintiff, which awards damages in an amount that is three times the amount of all sums paid by the United States of America as a result of Defendants' violations of 31 U.S.C. § 3729, plus mandatory statutory penalties pursuant to 31 U.S.C. § 3729(a);

C. the Court award Plaintiff on his own behalf the maximum percentage of the proceeds collected by the United States of America as a result of the institution of this action, plus expenses, costs and attorneys' fees incurred by Plaintiff in bringing this action, as authorized by the False Claims Act, 31 U.S.C. § 3730(d)(1)-(2); and

D. the Court award Plaintiff such other and further relief as the Court deems just and proper.

Respectfully Submitted,

HOCHMAN PLUNKETT CO., L.P.A.
James Hochman, # 0007100
Brett Bissonnette, # 0076527
3077 Kettering Blvd., Suite 210
Dayton, OH 45439
Phone: 937- 228-2666
Facsimile: 937- 228-0508
jimhochman@hochmanplunkett.com
BRB@hochmanplunkett.com


KOREIN TILLERY, LLC
John W. Hoffman
(application for admission to be filed), MO Bar. No. 41484
One US Bank Plaza
505 N. 7th Street, Suite 3600
St. Louis, MO 63101
Phone: 314-241-4844
Facsimile: 314-241-3525
jhoffman@koreintillery.com

*ATTORNEYS FOR PLAINTIFF-RELATOR*